UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROYCE WILLIAMS,

    Plaintiff,

                           Case No.: 3:05-cv-479-J-33MCR

vs.

ASPLUNDH TREE EXPERT CO.,

    Defendant.

_____/

**ORDER**

This matter comes before the Court pursuant to Defendant's
Motion for Summary Judgment (Doc. # 22), filed on April 14, 2006
and memorandum in support (Doc. # 23). Plaintiff filed a response
in opposition to the motion for summary judgment on May 5, 2006
(Doc. # 30).

After due consideration and for the reasons stated in this
Order, the motion for summary judgment is denied as to each count
of Plaintiff's complaint.

I.  **Legal Standard**

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party

-1-

is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477

-2-

U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981), <u>cert.</u> <u>denied</u>, 456 U.S. 1010 (1982).

## II.  <u>Background</u>

On May 24, 2005, Plaintiff filed a seven count complaint against Defendant, his former employer. (Doc. # 1) In Count One, Plaintiff alleges that Defendant engaged in willful discrimination based on race in violation of Title VII of the Civil Rights Act of 1964. Specifically, Plaintiff alleges hostile work environment and discriminatory discharge from

-3-

employment.   In Count Two, Plaintiff alleges that the racially discriminatory acts allegedly committed by Defendant and its agents and employees violated the Thirteenth Amendment to the United States Constitution as protected by 42 U.S.C. § 1981 by illegally infringing Plaintiff's ability to contract for and obtain employment free of racial discrimination.   In Count Three, Plaintiff alleges that Defendant's actions violated the Florida Civil Rights Act of 1992's prohibition of race discrimination. In Count Four, Plaintiff alleges that Defendant's agents or employees committed battery. In Count Five, Plaintiff alleges that Defendant's agents or employees assaulted Plaintiff.   In Count Six, Plaintiff brings an intentional infliction of emotional distress claim against Defendant.   In Count Seven, Plaintiff brings a negligent retention claim.   In addition, Plaintiff seeks attorneys' fees and costs.

The facts, as stated in Plaintiff's complaint, follow. Plaintiff applied for a job with Defendant in November of 2003. (Doc. # 1 at 3).   He attended an interview accompanied by his girlfriend, Angela Arteaga. (<u>Id.</u>)   Two of Defendant's employees (a general foreman and a supervisor) conducted the interview. (<u>Id.</u>) Plaintiff alleges that, during the interview, Plaintiff informed Defendant's employees that Plaintiff had a felony conviction on his record. (<u>Id.</u>) Plaintiff claims that, in

-4-

response, Defendant's general foreman advised Plaintiff that the felony conviction would not be a problem because other employees also had such records, but that "because he was a felon and because he was black, he would not be eligible for any raises or promotions within Asplundh." (Id.)  Plaintiff alleges that the general foreman further stated, "We need a black on the job to meet our quota." (Id. at 3-4).  In need of employment, Plaintiff accepted the job. (Id. at 4).

Plaintiff described the duties of his employment with Defendant as "gathering logs, limbs, and debris that had been cut away from electrical power lines." (Id.)

Plaintiff alleges that, shortly after he was hired, his supervisors became "hostile, abusive, and physically violent toward Williams because of his race." (Id.)  Plaintiff further alleges that he was subjected to "vicious, frequent, and reprehensible instances of racial harassment racial epitaphs [sic], racial violence, racially discriminatory disciplinary actions, physical violence, assault, battery, and retaliation for opposing race discrimination in the course of [his] employment with Asplundh." (Id.)

Plaintiff alleges that supervisors were aware of the discrimination and harassment, but failed to take action to prevent further harm to Plaintiff. (Id.)

-5-

According to Plaintiff, the supervisors "routinely referred to Williams as 'Nigger' and frequently threatened Williams with a 'Noose,' a common instrument of killing slaves in the antebellum south." (Id. at 5).   Plaintiff further alleges, "Asplundh supervisors would frequently say: 'Hey Nigger, pick up those limbs,' 'Hurry up, Nigger,' ' Get out of the way, Nigger.'" (Id. at 5).

Plaintiff alleges that, in addition to name calling and threatening him with nooses, his supervisors called his girlfriend, Angela Arteaga, and his friend and co-worker, Joe Bisque, "Nigger lover." (Id. at 6, 8).   He further alleges that he was given the most dangerous assignments due to his race. (Id. at 5-6).   He also alleges that his supervisors threw limbs and other debris down from trees in an effort to strike Plaintiff. (Id. at 5).

Plaintiff also alleges that two of his supervisors constructed a noose, threw it at Plaintiff, told him to "try it on, Nigger" and then threatened to throw the other end of the rope into the wood chipper, and did, in fact, throw one end of the rope in the direction of the wood chipper. (Id. at 8). Plaintiff submits that one of his supervisor told him to run through the woods "like a hog" so that his supervisor's hunting

-6-

dogs could chase him. (<u>Id.</u> at 7).   Plaintiff alleges that he was asked to step out of the picture when a news crew came to take photos of the job site. (<u>Id.</u> at 6-7).   Plaintiff further alleges that he was deprived of water by his supervisors. (<u>Id.</u> at 7).   In addition, Plaintiff alleges that he was subjected to humiliation during a bucket training exercise, where he was forced to "beg" to be brought down to the ground after being suspended in the air in a bucket for an extended period of time. (<u>Id.</u> at 6). Plaintiff also alleges that he was pushed from a moving truck. (<u>Id.</u> at 8).   Plaintiff was the only African American worker on his job site, and Plaintiff alleges that the above-described acts constitute race discrimination, particularly, a racially hostile work environment. (<u>Id.</u> at 5).

In May 2004, Plaintiff suffered a work-related injury when he strained his back.   Plaintiff went on workers' compensation leave and received benefits.   While on leave, according to Defendant (Doc. # 23-1 at 4), Plaintiff contacted the National Association for the Advancement of Colored People (NAACP) and indicated that Plaintiff was harassed by his employer due to his race.   The NAACP sent a letter to Defendant requesting that an investigation take place concerning Plaintiff's allegations of racial harassment.   Defendant alleges that it conducted a

thorough investigation into these facts. (Hawley Dep. Doc. # 23-8). A memorandum was generated by Defendant at the conclusion of the investigation. That memorandum has been filed, and it indicates that the word "Nigger" was used around Plaintiff "in a joking manner." The investigation memorandum references Plaintiff's noose or "threatening ropes" allegations, but does not reach a conclusion regarding the allegations concerning the noose threats.[1]

Defendant indicates that it terminated Plaintiff while Plaintiff was on workers' compensation leave because Defendant

---

[1]The "Harassment Investigation Final Report," created by David Hawley, states in part:

> The overall evidence does point to the fact that Royce did hear the word "sand nigger" used on the job site. There is credible evidence that the word "nigger" was used in jokes by employees to and around Royce Williams and Joey Bisque. It seems that there was a permissive allowance of this on the part of Royce. There are some statements that indicate that Royce himself engaged in the use of slang words of a racial nature. The interviews indicate that this was accepted at one time among some select employees but at one point, Royce Williams felt it was going too far or being done by employees that he did not like. The statements about the use of ropes in a threatening manner are harder to pin down as several employees state the rope was not used to threaten Royce or anyone, but to raise and lower tools and rope limbs. However, there is credible evidence that the rope was thrown up into a truck where Royce was sitting during a lunch break. All indications are that Ken Christian did this and he is no longer with the company (Doc. # 30-15 at 14).

was contacted by Plaintiff's probation officer, and Defendant learned of Plaintiff's felony record. (Doc. # 23-1 at 4). Defendant explains that its contract with Florida Power and Light restricts Defendant's authority to hire employees with certain criminal histories.[2]

Defendant also notes in its motion for summary judgment that "After receiving this information, Defendant reviewed Plaintiffs' criminal background report initially prepared for the company at the time of hire. On that report, it was unclear as to the final disposition of Plaintiff's felony arrests. It appears that Plaintiff had not been convicted of any felony within the seven year time period proscribed by the FP&L contract." (Doc. # 23-1 at 5). In essence, although Defendant fired Plaintiff due to his felony record, further review of Plaintiff's criminal background reveals that Plaintiff's record may not have contained the level of criminal activity that would have prevented him from working under the FP&L contract after all.

Plaintiff alleges that Defendant terminated Plaintiff, not due to his criminal record, but because Plaintiff is an African

---

[2]According to Hawley's declaration, Defendant's contract with FP&L "requires that Asplundh not retain any employee who has a felony conviction within the past seven years, or who has more than two misdemeanors within the past five years, if the misdemeanors were for violent or drug related offenses." (Hawley Decl. Doc. # 23-3 at 2).

American.

## III. __Analysis__

### A.  __Title VII Hostile Work Environment__

Plaintiff alleges that Defendant created a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

The parties agree that Plaintiff must establish the following elements to maintain a hostile work environment claim: (1) that the Plaintiff belongs to a protected group; (2) that the Plaintiff has been subjected to unwelcome racial harassment; (3) that the harassment was based on Plaintiff's race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive working environment; and (5) that there is a basis for holding the employer liable.  __Gupta v. Fla. Bd. of Regents__, 212 F.3d 571, 582-83 (11th Cir. 2000).

#### 1. __Protected Group__

It is not disputed that Plaintiff, as an African American, is a member of a protected group.

#### 2.  __Unwelcome Harassment__

Defendant argues that there is no disputed issue of fact and that Plaintiff did not suffer unwelcome harassment.  Plaintiff, on the other hand asserts that he was repeatedly subjected to

-10-

unwelcome harassment. "It is repeated incidents of verbal harassment that continue despite the employee's objections that are indicative of a hostile work environment and not simply some magic number of racial or ethnic insults." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1276 (11th Cir. 2002)(internal citations omitted).

Defendant has attached to its motion for summary judgment the declarations and deposition excerpts of several of Defendant's employees. Defendant asserts that these declarations and deposition excerpts demonstrate that all of the alleged harassment was a "joke" and constituted horseplay, rather than unwelcome race discrimination. Defendant also submits that Plaintiff did not suffer unwelcome harassment because Plaintiff failed to complain about the alleged harassment when given an opportunity to do so.

The declaration of Marvin Chinell, Jr., an Asplundh crew foreman, indicates that he, Chinell, used the word "nigger" in a joking way. (Chinell Decl. Doc. # 23-2 at 1). Specifically, his declaration states:

> When Mr. Williams worked on my crew, we got along very
> well. Mr. Williams and I would often joke around with
> each other. I can recall jokingly using the "n-word"
> to both Mr. Williams and Joey Bisque, a white employee,
> on a couple occasions. For example, I can remember
> saying to both Mr. Williams and Mr. Bisque "come on my
> niggers, let's get back to work." I did not intend

> this comment to be insulting to Mr. Williams based upon
> his race, but rather I used it in a joking manner,
> directed to both Mr. Williams and Mr. Bisque.

(Chinell Decl. Doc. # 23-2 at 1).

The declaration of David Hawley, an Asplundh Compliance Officer, states that Plaintiff complained about his supervisors smoking marijuana on the job and raised other complaints, but never mentioned racial harassment. (Hawley Decl. Doc. # 23-3 at 2-3). The declaration of Ed Sanders, a general foreman that supervised Plaintiff, states:

> All of our employees in the Lake City area work out in
> the field. The work environment is very similar to
> your typical construction environment, where there is a
> lot of horseplay, goofing around and salty language.
> At one point, there was so much goofing around and
> trash talking that I had to speak with all of the
> employees. I did not observe the employees engage in
> any behavior that was aimed at any certain person or
> group of people, but rather, just observed general
> goofing off and joking around. No employee ever
> complained to me that they felt the work environment
> was hostile, abusive or threatening. Had they done so,
> I would have addressed the matter or taken it to my
> supervisor. Mr. Williams never complained to me that
> he was being discriminated against or treated unfairly
> based upon his race. At one point, Mr. Williams and
> Mr. Joey Bisque (Caucasian) did advise me that they
> felt Ed Timmerman was not treating them nicely . . . I
> never observed any harassment or discrimination. I
> never made any employment decisions based upon Mr.
> Williams' race.

(Sanders Decl. Doc. # 23-4 at 3-4).

In addition, the declaration of Ed Timmerman, a crew foreman, states:

-12-

> I do recall hearing Mr. Williams, Mr. Joey Bisque
> (Caucasian) and Mark Chinell (Caucasian) use the word
> nigger on the job site.  From what I observed, this was
> done in a joking manner.  Because we work in a
> construction industry, there is a lot of horseplay and
> joking around.  I have never witnessed any joking
> around that appeared to be harassing or cruel.  I have
> used the term "nigger-rigged." I have used this term to
> refer to equipment that has not been properly fixed,
> but that was made serviceable on a short term basis. .
> . .   When I am in a tree, I will generally just drop
> the smaller branches and debris to the ground below . .
> . . I have never hit or injured an employee doing this,
> nor have I intentionally thrown limbs or debris from
> tress in an effort to hit or scare an employee.
> . . . .
> During the period that Mr. Williams worked with
> Asplundh, I never took any action against Mr. Williams
> or made any comments to Mr. Williams that were intended
> to harass or discriminate against Mr. Williams.

(Timmerman Decl. Doc. # 23-5 at 2-4).

To summarize Plaintiff's deposition, which is quoted _infra_, Plaintiff alleges that he was called "Nigger" at work by his supervisors in a demeaning and non-joking manner, threatened at work with nooses, pushed out of a moving truck, and subjected to other forms of racial harassment, and he now suffers from anxiety and other emotional problems.

A material issue of fact exists concerning whether Plaintiff suffered from unwelcome harassment.  Although Defendant's employee's declarations support the notion that Plaintiff failed to complain to supervisors and that Plaintiff went along with the "joking" and "salty language," a reasonable jury could find that

Plaintiff was subject to unwelcome harassment. A jury, rather than the Court, should determine whether, at the time of the incidents, Plaintiff regarded the alleged conduct as a joke, or whether Plaintiff regarded the conduct as unwelcome racial harassment.

### 3. <u>Racially Motivated Harassment</u>

In this case, evidence supports Plaintiff's allegations that he was repeatedly referred to as "nigger," was threatened with nooses crafted by Defendant's agents and employees, and was threatened with physical injury due to his race.

Plaintiff's deposition and declaration, as well as the declaration and deposition of Joey Bisque support the allegation that Ed Timmerman and Ken Christian, Asplundh supervisors, would often say to Plaintiff: "Hey Nigger, pick up those limbs," "hurry up, Nigger," "Get out of the way, Nigger," "Catch this, Nigger," "Nigger, go up there and grab those power lines and push them out of the way," and "Try it on, Nigger." (Pl.'s Decl. Doc. # 30-2 at 3; Bisque Dep. Doc. # 30-9 at 1-15). Andrew Burnham's declaration also supports that "Ed Timmerman would call Royce Williams 'Nigger' in a hostile manner . . . . [and] use the word 'nigger-rigged' toward Royce Williams, who was the only black . . . . working for Asplundh." (Burnham Decl. Doc. # 30-5 at 2). As noted <u>supra</u> Chinell admitted to calling Plaintiff and Bisque his

-14-

"niggers." (Chinell Decl. Doc. # 23-2 at 1).

Plaintiff stated during his deposition that he heard "nigger jokes." (Pl.'s Dep. Doc. # 23-6 at 22). Plaintiff further stated that Travis Raulerson said "nigger," "sand nigger" and "nigger-rigged." (Pl.'s Dep. Doc. # 23-6 at 27).

Plaintiff also stated that Tim "Doc" Smith made jokes about African Americans (Pl.'s Dep. Doc. # 23-6 at 28-29). Defendant argues that the Asplundh workers were in a coarse, construction-type environment, and that they may have engaged in some politically incorrect "salty" jokes, but that the highest level of civility is not required.

As stated in <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 81-82 (1998):

> A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field-even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Taking into consideration the social context of Plaintiff's

employment as a tree worker, there is a material issue of fact as to whether the "jokes" Plaintiff heard at work and the name calling constituted racially motivated discrimination under the totality of the circumstances.

In addition to jokes and name calling, Plaintiff states in his deposition that he rode in a truck with Ken Christian and that Christian smoked marijuana in the truck and hung nooses in the truck made from ropes and earplug strings. (Pl.s Dep. Doc. # 23-6 at 32).

During Plaintiff's deposition, Plaintiff was asked if he was sure if the "knot" in Christian's work truck was a noose, and Plaintiff replied that he was sure that it was a noose because he had seen nooses in western movies. (Pl.'s Dep. Doc. # 23-6 at 35). Plaintiff acknowledged that he did not have experience with knots. (Pl.'s Dep. Doc. # 23-6 at 34-37).

Plaintiff alleges that Christian would place nooses in Plaintiff's seat in the truck and in Plaintiff's hard hat. (Pl.'s Dep. Doc. # 23-6 42). Plaintiff also alleges that nooses were thrown on him and in his direction on the job site. (Pl.'s Dep. Doc. # 23-6 at 45). Plaintiff alleges that nooses were thrown at him and knocked food out of Plaintiff's lap. Id.

Plaintiff alleges that Timmerman and Christian constructed a noose, threw it at Plaintiff, told Plaintiff to "try it on,

-16-

Nigger" and threatened to place the other end of the rope in the wood chipper. (Pl.'s Dep. Doc. # 23-6 at 51-52).   Plaintiff alleges that he thought that his supervisors intended to murder him.  (Pl.'s Dep. Doc. # 23-6 at 53).

The Declaration of Andrew Burnham, a fellow employee at Asplundh, states: "It was common knowledge in the workplace that Mr. Timmerman threatened Mr. Williams with a 'Noose' made of rope." (Burnham Decl. Doc. # 30-5 at 2).

Defendant stridently denies that any nooses were used to threaten or intimidate Plaintiff.  The Declaration of Timmerman is in direct conflict with Plaintiff and Bisque's deposition as well as Burnham's declaration, and states:

> In performing my duties, I often use rope to raise and lower equipment when I am in a tree or the bucket, and also to lower large limbs when I am in a tree or a bucket.  I generally use a rope that is tied in a knot. I use many different types of knots to raise and lower equipment and limbs, but I have never used a noose.  I use primarily six different types of knots: snare, slip, running bowline, station bowline, top line hitch, or clove  hitch.   These types of knots are the best type of knots to use because the loop can easily be made bigger or smaller.  These knots are not the same as a "hangman's noose" although they are similar in size, shape, and functionality.   I often have many ropes tied in various knots in my truck and in my bucket when I am working, but none of them have ever been in nooses.

(Timmerman Decl. Doc. # 23-5 at 1-2).

There is a material issue of fact as to whether the "nooses"

-17-

Plaintiff describes were actually tools of the trade, ropes tied in knots to raise and lower tree limbs and light equipment, or if, at times, the same ropes were tied to resemble nooses to harass and threaten Plaintiff due to his race.  There is a genuine conflict in the evidence on this issue, and a jury must examine the evidence.

Plaintiff further alleges in his deposition that, while on drugs and using racial slurs, Timmerman instructed Plaintiff to pull limbs from live power lines, a job that Plaintiff was not trained to do. (Pl.'s Dep. Doc. # 23-6 at 53-54).

Defendant, on the other hand, asserts that it was in the proper scope of Plaintiff's employment to remove debris from power lines.  Plaintiff asserts that he was not trained to perform this task, and was asked to do this most dangerous of jobs because he is an African American.  There is a genuine issue of material fact as to whether Plaintiff was simply asked to perform his job regarding the debris on the power lines, or whether, because of Plaintiff's race, he was given the most dangerous and least favorable of working conditions.

Plaintiff claims that he was pushed out of a moving truck by his supervisor Ken Christian and, as a result, twisted his ankle. (Pl.'s Dep. Doc. # 23-6 at 66-70).  Defendant denies that this happened, and argues that, if it did happen, that it was an

-18-

isolated incident unrelated to Plaintiff's race.

Plaintiff alleges in his deposition that Ken Christian "asked me [Plaintiff] to run through the woods like a hog to see if his dogs could catch me, and he had his rifle in his truck that he drove that day." (Pl.'s Dep. Doc. # 23-6 at 71). Defendant asserts that the rifle was in the truck and that the dogs were in cages, so Plaintiff was not actually in as much fear as he alleges. Defendant does not deny that Christian asked Plaintiff to run like a hog and be chased by hunting dogs. Defendant asserts that this strange request was not racially motivated. The Court will let the trier of fact decide whether such a request was a joke or whether Christian, one of Plaintiff's supervisors, had race in mind when asking Plaintiff to run "like a hog" and be subjected to a chase by hunting dogs. It should also be noted that no white employees were asked to join the chase.

Plaintiff alleges that he was denied access to water on the job when the foremen failed to fill the workers' water cooler. Defendant asserts that there is no evidence that this was done to injure Plaintiff, and that if the water cooler went dry, that affected all workers, regardless of their race. The Court tends to agree with Defendant that the lack of water for the workers was not an incident of racial discrimination.

-19-

Plaintiff alleges that when a newspaper reporter came to take a picture of the job site, Timmerman asked Plaintiff to step out of the picture. (Pl.'s Dep. Doc. # 23-6 at 110). As to this allegation, Defendant points out that Plaintiff cannot prove that other employees were not asked to get out of the picture, and that Plaintiff does not know what the subject of the article for the paper was about. There is a material issue of fact as to whether Plaintiff was asked to step out of the picture because he is an African American or for other, non-discriminatory reasons.

The declaration of Plaintiff's girlfriend, Angela Arteaga, states that she accompanied Plaintiff on Plaintiff's job interview at Asplundh, and that she was told that Asplundh needed a black employee to meet a quota, but that Plaintiff could not be promoted or advance in the company because he was black. (Arteaga Decl. Doc. # 30-6 at 1). She states that she visited the work site, asked for Plaintiff, and that Ken Christian asked her "what do you want with that Nigger?" (Id.) She reports that some Asplundh employees called to her, "Let us see your titties" and then she heard Ken Christian call out, "Just leave that Nigger lover alone." (Id.)

Plaintiff's white co-worker, Joe Bisque, alleges to have stood up for Plaintiff against the harassment. Bisque stated in his deposition and declaration that he was called "nigger lover,

wigger, southern disgrace, and white trash" for "no other reason than being friends with Royce [Plaintiff]." (Bisque Dep. Doc. # 30-9 at 3). Bisque further testified that Ed Timmerman and Ken Christian would ask him "why do you want to hang out with a nigger? . . . You're not a nigger lover, are you?" (Id. at 4). Bisque stated in his deposition that he complained about the racial harassment that both he and Plaintiff faced, and that after the complaints, the supervisors would laugh at him, and the harassment just got worse. (Id.) During the deposition, Bisque was asked if the Ed Timmerman and Ken Christian were just "joking" with Plaintiff, and Bisque indicated that it was in a belittling and hurtful, and not joking, manner. (Bisque Dep. Continued Doc. # 30-10 at 9).

Numerous questions of material fact prevent this Court from granting summary judgment. Further, a reasonable jury could find that the harassment alleged in this case was racially motivated.

### 4. <u>Severe or Pervasive Harassment</u>

In a Title VII harassment case, such as the present case, the plaintiff must establish that the harassment was either severe or pervasive. <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245 (11th Cir. 1999). Here, Plaintiff alleges that the harassment was both severe and pervasive. Further, as explained in <u>Mendoza</u>, the harassment must be objectively and subjectively severe or

pervasive.  Id. at 1246 ("the environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive.") (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Based on Plaintiff's deposition testimony and declaration, a reasonable jury could find that Plaintiff subjectively perceived his working environment as severely and pervasively infused with racial discrimination.

To evaluate whether the alleged harassment is either severe or pervasive, and altered an employee's terms of employment from an objective standpoint, the Court will evaluate the allegations under the following four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997)(citing Harris, 510 U.S. at 23). As explained in Mendoza, 195 F.3d at 1246, plaintiffs are not required to demonstrate the presence of each and every factor, and courts should make the determination as to objective severity or pervasiveness under a "totality of the circumstances" evaluation.

### i.  **Frequency**

In the Eleventh Circuit hostile work environment case of <u>Miller</u>, 277 F.3d at 1276, the court found that a Mexican American demonstrated that harassing conduct was frequent when he was called racial slurs daily for one month.  The <u>Miller</u> court indicated, "Certainly, the conduct at issue here was as frequent as conduct we have previously held to be sufficient to constitute an objectively hostile work environment." <u>Id.</u>  In the present case, Plaintiff indicates that he was harassed and called "Nigger" for seven months, which is more frequent than the harassment of a single month described in the <u>Miller</u> case. (Pl.'s Decl. Doc. # 30-2 at 3).  Plaintiff has met his burden as to this factor.

### ii.  **Severity**

Plaintiff also alleges that the conduct he endured was severe.  Plaintiff does not allege that, from time to time, he heard a racial slur.  As described in detail <u>supra</u>, Plaintiff points to evidence in the record which demonstrates that Plaintiff was referred to as a "Nigger" regularly and that his girlfriend and friend were openly referred to as "Nigger lovers." The declaration of Chinell directly states that he referred to Plaintiff and Bisque (a Caucasian co-worker) as "my Niggers." Plaintiff alleges that Christian told Plaintiff to run through

-23-

the brush like a hog so that hunting dogs could chase him.  There is also credible evidence that Plaintiff was threatened with nooses.  Plaintiff has alleged very severe conduct in this case.

### iii. Physically Threatening or Humiliating

The Court must also evaluate whether the conduct alleged is physically threatening or humiliating.  In this case, Plaintiff alleges that he was given the most dangerous and potentially life threatening assignments (such as removing debris from live electrical wires) due to his race.  He indicates that his supervisors intentionally aimed to injure Plaintiff on the job by throwing debris from high in the trees in Plaintiff's direction.

Plaintiff also alleges that he was threatened with nooses, that nooses were constructed, thrown in his direction, and that he has been threatened to be injured with the wood chipper.  In addition, Plaintiff alleges that he was thrown from a moving car and that he was humiliated during "bucket training."

In addition, Plaintiff alleges that he has dreams every night in which Asplundh employees are shooting him or hanging him (Pl.'s Dep. Doc. # 23-6 at 88, 90). Plaintiff says that, as a result of his work place harassment, he has anxiety and erectile dysfunction (Pl.'s Dep. Doc. # 23-6 at 95).  The record contains the deposition testimony and report of a physician who treated Plaintiff when Plaintiff suffered an on-the-job back injury and

-24-

sought workers' compensation.   Dr. Mhatre saw Plaintiff on December 27, 2004, for a psychiatric evaluation through his worker's compensation company.   Dr. Mhatre filed a report that indicated, among other things that Williams:

> [R]eports that "everything bothers me."  He gets angry at his girlfriend who is Caucasian, he has repeated nightmares about being hung from a tree, being chased out of his house by white people holding guns.  He also has nightmares about being electrocuted with power lines on the job, as well as having one specific dream when he is driving past Walmart when a white man pulls down the window and shoots him in the neck with an arrow.  He feels increasingly isolated, he doesn't want to leave home, and especially wants to avoid any contacts with white people.  He reports having poor sleep patterns, though he reports his appetite is still good.  He also has become increasingly obsessive, wanting everything kept in a certain way at home.

(Doc. # 30-4 at 4).

Dr. Mhatre diagnosed Plaintiff with post-traumatic stress disorder pursuant to "receiv[ing] significant harassment on the job." (Id. at 5).

This Court submits that Plaintiff has pointed to evidence of physically threatening and humiliating harassment.

### iv.  Interference with Plaintiff's Job Performance

This Court must also consider whether the conduct alleged unreasonably interfered with Plaintiff's job performance.

It is true that Plaintiff indicated in his deposition that

-25-

he ranked himself as an excellent employee.[3]   However, as correctly pointed out by Plaintiff, the element of "interference with work performance," is not a *sine qua non*, as the issue "is not whether work has been impaired, but whether working conditions have been discriminatorily altered." Harris, 510 U.S. at 25 (Scalia, J., Concurring).

This Court finds particularly instructive, with regard to the issue of Plaintiff's work performance, the following passage from the Harris case:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown.   A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race . . . . offends Title VII's rules of workplace equality.

Harris, 510 U.S. at 22.

From the deposition testimony and declarations of Plaintiff, Bisque, and Arteaga, as well as other evidence on file, the Court determines that a reasonable jury could find that

---

[3] On a scale of one to ten, ten being the best, Plaintiff indicated that he was a "10" at work. (Pl.'s Dep. Doc. # 23-6 at 73).

the harassment alleged by Plaintiff could constitute severe and pervasive harassment that resulted in an abusive working environment. Accordingly and under the totality of the circumstances, Plaintiff has demonstrated that there is a material issue of fact as to the issue of whether the harassment was severe or pervasive, precluding summary judgment on this issue.

### 5.   **Employer Liability for Hostile Work Environment**

This Court must now determine whether there is a basis for holding Defendant, the employer, liable. As correctly argued by Plaintiff, Defendant's legal responsibility for the harassment can be established by showing that either (1) the harassment was perpetrated by a supervisor with immediate or successively higher authority over the plaintiff, or (2) the harassment was perpetrated by a co-worker, that the employer knew or should have known of the harassment, and that the employer failed to take prompt corrective action. Burlington Indus. v Ellerth, 524 U.S. 742, 762-63 (1998); Miller, 277 F.3d at 1278 (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000).

In this case, Williams describes racial harassment perpetrated by his direct supervisors, the foremen: Christian and Timmerman. The employee handbook for Asplundh states, "The

Foreperson is assigned **complete responsibility** for your crew: to train you, and to solve your work problems as they occur." (Doc. # 30-16 at 6).

A reasonable and fair-minded jury could find a basis for holding Defendant responsible for what happened, as it is alleged that Plaintiff's direct supervisors, Christian and Timmerman, called him "Nigger;" threatened him with ropes, nooses, the company wood chipper, and other means; pushed him from a work truck; and perpetrated other forms of harassment during working hours and in an effort to get work completed for Asplundh.  All of the alleged harassment happened on the job or in an Asplundh truck.

Accordingly, this Court declines to enter summary judgment for Defendant on Plaintiff's Title VII hostile work environment claims.

B.   **Title VII Discriminatory Discharge**

Plaintiff's complaint also alleges that he was terminated due to being an African American in violation of Title VII of the Civil Rights Act of 1964.  Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42

-28-

U.S.C. § 2000(e)-2(a).

A plaintiff claiming race discrimination of this type can prove his case through direct or circumstantial evidence. Standard v. ABEL Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998); Kincaid v. Board of Trustees, Stillman College, no. 05-15974, 2006 U.S. App. LEXIS 16355, at *11 (11th Cir. June 27, 2006)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973)).  If the plaintiff relies on circumstantial evidence, the Court applies the McDonnell Douglas burden shifting analysis, and the defendant can rebut an inference of discrimination raised by the plaintiff by demonstrating that it had a legitimate, non-discriminatory reason that the plaintiff must then prove is pretext for discrimination. McDonnell Douglas Corp., 411 U.S. at 802-07.

In contrast to the burden shifting test used when the plaintiff's case is based on circumstantial evidence, when the plaintiff has direct evidence of discrimination and can prove that an illegal discriminatory motive was a significant or substantial factor in an employment decision, the defendant can only rebut the inference of discrimination by "proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor." Lee v. Russell County Bd. of Educ., 684 F. 2d 769, 774 (11th Cir.

1982)(citing <u>Mt. Healthy City Sch. Dist. v. Doyle</u>, 429 U.S. 274, 287 (1977)).

This Court must determine whether Plaintiff's case proceeds on circumstantial or direct evidence. The Eleventh Circuit in <u>Kincaid</u>, 2006 U.S. App. LEXIS 16355 at *13, explains that "[d]irect evidence of discrimination is evidence which, if believed, would prove the existence of a fact at issue without inference or presumption. When determining whether a statement is direct evidence of discrimination, we consider timing and whether the person making the statement was a decisionmaker." (Citations omitted).

Plaintiff appears to argue that there is direct evidence that he was terminated due to his race. Plaintiff points to the allegation that, during his interview, he was told: (1) that he was hired to meet a quota for black employees; (2) that he would not receive any promotions or advance because his is black; and (3) his criminal record would not affect his employment opportunities at Asplundh. The Court does not find that these statements constitute direct evidence of racial motivation in terminating Plaintiff's employment. In the present case, the Plaintiff was terminated by Hawley, and Plaintiff does not present evidence that Hawley stated that Plaintiff was fired due to his race or that Hawley had a direct racial motive to

-30-

terminate Plaintiff.   Consistently, Hawley has indicated that he terminated Plaintiff due to his belief that Plaintiff's criminal history would violate the contract between Asplundh and FP&L.

This Court will therefore employ the McDonnell Douglas, burden shifting test. 411 U.S. at 802.   The Eleventh Circuit recently decided a Title VII race discrimination case involving an alleged racially motivated discharge in Dickinson v. Springhill Hospitals, Inc., case no. 05-16885, 2006 U.S. App. LEXIS 16613 (11th Cir. 2006).   There, the plaintiff, an African American nurse, alleged that she was fired due to her race and created an inference of discrimination by alleging (1) that, as an African American, she is a member of a protected class, (2) that she was qualified for the position; (3) that she suffered an adverse employment action; (4) and that she was replaced by a person outside her protected class or was treated less favorably than a similarly situated individual outside of her protected class. Dickinson, 2006 U.S. App. LEXIS at *7.

In this case, Plaintiff is a member of a protected class. Plaintiff asserts that he was qualified for the position and Defendant does not appear to argue to the contrary.   It is not disputed that Plaintiff was fired.   Plaintiff asserts that he was treated less favorably than similarly situated individuals outside of his protected class.   Specifically, Plaintiff argues

-31-

that Defendant retained employees with criminal records and terminated Plaintiff, an African American despite his background check papers indicating that Plaintiff's record was sufficiently clean to work under the FP&L contract.

Defendant counters that it fired Plaintiff due to Plaintiff's criminal record. Hawley's declaration states in pertinent part:

> In my position as Compliance Officer . . . . I received a telephone call from Mr. Aaron Roberts, a Probation Officer for the State of Florida. Mr. Roberts contacted me to ascertain whether Mr. Williams was gainfully employed. Mr. Roberts advised me that full time employment was a condition of Mr. Williams' probation. Mr. Roberts also advised me that Mr. Williams was on probation for a felony drug conviction. This immediately raised concerns because of Asplundh's contract with FP&L. I immediately pulled Mr. Williams' file to determine whether a background check had been completed on him at the time of hire. I learned that Asplundh did perform a background check on Mr. Williams at the time of his hire. In reviewing that background check, it showed that Mr. Williams had two misdemeanor convictions and therefore appeared eligible to work on the FP&L contract. The felony drug conviction for which Mr. Williams was on probation did not appear as a conviction and in fact showed no disposition. Mr. Roberts, the Probation Officer, had advised me that Mr. Williams was adjudicated guilty of these felonies, including two felony charges for the sale of cocaine with[in] 1000 feet of a school and two felony charges of possession of cocaine with the intent to sell within 1000 feet of a school. . . . Because the criminal background report prepared on behalf of Asplundh did not show any criminal conviction disqualifying Mr. Williams from working under the FP&L contract, Mr. Williams' hire had been approved by Mel. Riely, then Regional Manager. Based upon the new information received from Mr. Williams' Probation Officer, Mr.

-32-

> Williams was ineligible for work for Asplundh under the FP&L contract.  Mr. Williams had a felony conviction (four) within the preceding seven years and therefore Asplundh had not [sic] choice but to terminate Mr. Williams' employment.

(Hawley Decl. Doc. # 23-3 at 3-4).

Despite this evidence, there is a material issue of fact as to whether Plaintiff had a criminal record that would, in fact, cause Defendant to disqualify Plaintiff as an employee under Defendant's standards.  During Mr. Hawley's deposition, it appears that Hawley acknowledges that Plaintiff's criminal record would, in fact, not bar him from working under the FP&L contract. (Hawley Dep. Doc. # 30-15 at 6).  A reasonable jury could find that Defendant was aware of Plaintiff's criminal record at all times and that such record was not the real reason for firing Plaintiff, or that Defendant should have known of it, or that such record did not require Plaintiff's termination.  Further, due to the allegations in this case, and the credible evidence on file, such trier of fact could conclude that Defendant's alleged legitimate and non-discriminatory reason for firing Plaintiff (his criminal record) was a pretext for discrimination, and that, instead, Plaintiff was fired due to his race.[4]

---

[4]It should also be noted that the record contains evidence that Asplundh hired many employees with criminal records, including Hawley. (Hawley Dep. Doc. # 30-13 at 11-13).

As noted by Plaintiff, the Eleventh Circuit has admonished that summary judgment should be awarded to Defendants in race discrimination cases rarely because such cases usually involve the examination of motive and intent, questions for the jury, rather than the Court. <u>Batay v. Stone</u>, 24 F.3d 1330, 1336 (11th Cir. 1994). Indeed, the role of the jury in this matter must not be overlooked, and Defendant's motion for summary judgment as to the Title VII counts is denied.

### C.   <u>42 U.S.C. § 1981 and Florida Civil Rights Act of 1992</u>

Plaintiff's compliant also contains a count of race discrimination under Florida's Civil Rights Act of 1992 and a claim that Defendant violated the Thirteenth Amendment of the United States Constitution protected by 42 U.S.C. § 1981 by illegally infringing on Plaintiff's ability to contract for and obtain employment free of racial discrimination.

Defendant's Motion for Summary Judgment does not address these claims specifically. Because Plaintiff's Title VII claims have survived summary judgment, the Court finds that both the 42 U.S.C. § 1981 claim and the Florida Civil Rights Act claim survive Defendant's motion for summary judgment. This is because both 42 U.S.C. § 1981 and The Florida Civil Rights Act of 1992 were modeled after Title VII and are analyzed under the same framework. <u>See</u> <u>Turnes v. AmSouth Bank, N.A.</u>, 36 F.3d 1057, 1060

-34-

(11th Cir. 1994)(42 U.S.C. § 1981 claims are analyzed in the same manner as Title VII claims); <u>Standard v. A.B.E.L. Servs. Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998); <u>Gamboa v. American Airlines</u>, 170 Fed. Appx. 610, 612 (11th Cir. 2006)(claims under Title VII and the Florida Civil Rights Act are analyzed under the same framework).

Accordingly, Plaintiff's claims under 42 U.S.C. § 1981 and the Florida Civil Rights Act of 1992 survive Defendant's motion for summary judgment.

### D. **Assault**

Plaintiff claims that Asplundh supervisors Timmerman and Christian assaulted him on the job.  Assault is "an intentional unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another, under such circumstances as to create fear  of imminent peril, coupled with the apparent present ability to effectuate the attempt." <u>Lay v. Kremer</u>, 411 So.2d 1347, 1349 (Fla. 1st DCA 1982).  Plaintiff's allegation as to assault is summarized in Plaintiff's response to the motion for summary judgment: "From buckets high above the ground, Timmerman and Christian threw logs, branches and other debris at Plaintiff[.] Timmerman and Christian also threatened to throw Plaintiff into an activated wood chipper; Timmerman and Christian threw a noose at Plaintiff and stated 'try it on

-35-

Nigger' then, Timmerman took the other end of the rope and threw it toward the wood chipper, which was activated at the time." (Doc. # 30-1 at 17). Timmerman's declaration states that he did throw logs, branches, and debris to the ground from buckets high in the air. (Timmerman Decl. Doc. # 23-5 at 3) Timmerman's declaration, however, explains that he did this as part of his job, and that he never intended to strike anyone with the branches and other debris. (Id.) Plaintiff, on the other hand, submits that, Timmerman and others wrongfully aimed to strike Plaintiff with the dangerous debris.

In addition, Plaintiff alleges that he was threatened when his Caucasian supervisors constructed a noose, threw it at Plaintiff and told Plaintiff to try it on. Plaintiff further alleges that the other end of the rope was thrown toward the wood chipper. Defendant denies that this event occurred. Plaintiff has a witness, Joey Bisque, who indicated during his deposition that he saw the supervisors throw a noose at Plaintiff and himself on at least one occasion. (Bisque Dep. Doc. # 30-9 at 9).

There is a material issue of fact as to whether Plaintiff was assaulted by his supervisors. Even if Plaintiff was assaulted by his supervisors, Plaintiff must prove that the corporate Defendant, Asplundh, is liable through the theory of respondeat superior. Under Florida law, for Defendant to be sued

-36-

for the actions of its employees, Plaintiff must prove: (1) the conduct was the kind the employee (here, Timmerman and Christian) was employed to perform; (2) the conduct occurred during the working hours and at the Defendant's location; and (2) the conduct was activated at least in part by a desire to serve the employer. Ayers v. Wal-Mart Stores, Inc., 941 F.Supp. 1163, 1168 (M.D. Fla. 1996). There are definite issues of fact left to be determined on the issue of respondeat superior. For instance, whether Timmerman and others threw debris in Plaintiff's direction (with no harm intended) in the regular performance of Asplundh duties or whether Timmerman and others aimed to hit Plaintiff with the debris. Also, the issue of whether Christian and Timmerman threatened Plaintiff with nooses (to threaten and control Plaintiff as Plaintiff's supervisor) remains to be decided. In this case, the issue of whether to hold Asplundh liable for alleged assault is a jury question. Blount v. Sterling Healthcare, 934 F.Supp. 1365, 1373 (S.D. Fla. 1996)("The employer is not liable for the employee's torts if the employee has stepped aside from his employment or commits the tort to further some purpose of his own; however, if the tort is activated at least partly to serve the master, then respondeat superior liability mat exist. This is true even if the alleged wrong was a crime, was not authorized by the employer, or was

forbidden by the employer.  <u>Whether an employee's acts are within</u>
<u>the scope of employment is to be determined by the jury unless</u>
<u>they could conceivably only reach one conclusion</u>.")(emphasis
added, internal citations omitted).

At this point, the Court is precluded from granting
Defendant's motion for summary judgment on Plaintiff's assault
claim, as material issues of fact exist.

**E.   Battery**

Plaintiff asserts that Christian committed a battery upon
him.  Under Florida law, battery is defined as an intentional
infliction of a harmful or offensive contact upon the person of
another.  <u>Chorak v. Naughton</u>, 409 So.2d 35, 39 (Fla. 2nd DCA
1981).  Plaintiff alleges that Christian pushed Plaintiff from a
moving car, causing Plaintiff to injure his ankle.  Further,
Plaintiff alleges that Defendant's supervisors forced Plaintiff
to preform dangerous work involving power lines that Plaintiff
was not trained or qualified to do.

Defendant argues that it is not vicariously liable for
Christian's alleged pushing Plaintiff from the car because
Plaintiff has failed to prove <u>respondeat superior</u>.  In addition,
as to the power lines issue, Defendant asserts that Plaintiff was
in fact qualified and trained to remove debris from power lines
and that it was not a tort to require Plaintiff to perform the

-38-

duties of his job.  In addition, Defendant asserts that worker's compensation covers any claim Plaintiff may have for "being forced to touch dangerous wires" if in fact, Plaintiff was injured by touching the wires.

As with Plaintiff's assault claims, a jury will determine whether Asplundh employees committed a battery upon Plaintiff, and if so, whether Defendant should be held liable for such battery.

### F.   Intentional Infliction of Emotional Distress

In order to prove intentional infliction of emotional distress, Plaintiff must show that Defendant's conduct was intentional or reckless, outrageous, and caused emotional distress. De La Campa v. Grifols America, Inc., 819 So.2d 940, 943 (Fla. 3d DCA 2002).  "Outrageous" conduct is that which is so extreme that it goes beyond all possible bounds of decency. Metro. Life Ins. Co. v. McCarson, 467 So.2d 277, 279 (Fla. 1985). "Liability, however, does not extend to mere insults, indignities, threats, or false accusations." Williams v. Worldwide Flight Servs., 877 So. 2d 869, 870 (Fla. 3d DCA 2004).

In Williams v. City of Minneola, 575 So.2d 683, 691 (Fla. 5th DCA 1991), the court explained:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant

has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!"

Defendant cites several persuasive cases attempting to prove that the allegations of Plaintiff's complaint are not sufficient to support a claim for intentional infliction of emotional distress. See Lay v. Roux Laboratories, 379 So. 2d 451, 452 (Fla. 1st DCA 1980)("Here, the alleged conduct of [defendant] was that he began to threaten [plaintiff] with the loss of her job, then said defendant began using humiliating language, vicious verbal attacks, racial epithets and called plaintiff a nigger when an argument arose concerning a parking space. Although the alleged conduct is extremely reprehensible, we do not think that the alleged conduct reaches the level of outrageousness and atrociousness [for intentional infliction of emotional distress]"); Williams v. Worldwide Flight Servs., Inc., 877 So.2d 869 (Fla. 3d DCA 2004)(court dismissed intentional infliction of emotional distress claim although Plaintiff called "Nigger" and

"Monkey" and continuously threatened); <u>Vance v. S. Bell Tel. & Tel. Co.</u>, 983 F.2d 1573, (11th Cir. 1993)(affirming trial court's decision to dismiss Plaintiff's claim for intentional infliction of emotional distress although Plaintiff alleged that she was ostracized due to being an African American and that a noose was hung over her work station); <u>Brown v. Zaveri</u>, 164 F.Supp.2d 1354, 1363 (S.D. Fla. 2001)(plaintiff's intentional infliction of emotional distress claim rejected when plaintiff was a fast-food restaurant customer and manager of restaurant refused to serve plaintiff, ordered the rest of the staff to refuse to serve plaintiff, called plaintiff "Nigger," and repeatedly assaulted plaintiff).

However, the egregious allegations of the Plaintiff's complaint are distinguishable from the cases cited above. The jury is best suited to determine what conduct shocks the conscience of the community and rises to the level of outrageousness required for establishing an intentional infliction of emotional distress claim.

Accordingly, Defendant's motion for summary judgment is therefore denied as to Plaintiff's intentional infliction of emotional distress claim.

### G.   <u>Negligent Retention</u>

Plaintiff asserts that Defendant failed to sufficiently

investigate the qualifications of the employees that it hired and failed to fire employees that Plaintiff alleges were unfit for employment due to such employees' alleged propensity for violence and racial discrimination.

As stated in <u>Brown</u>, 164 F.Supp.2d at 1356, "An employer can only be held liable for a negligent retention claim when the employer has knowledge of an employee's predisposition to commit a wrong and places that employee in contact with a third party, creating an opportunity of enticement of the employee to commit such a wrong."

It is not disputed that Plaintiff and Plaintiff's co-worker Bisque met with Ed Sanders, a general foreman, to complain. Plaintiff asserts that he and Bisque brought the discrimination alleged in this case to the attention of Sanders. The Declaration of Sanders states:

> Mr. Williams never complained to me that he felt he was being discriminated against or treated unfairly based upon his race. At one point, Mr. Williams and Mr. Joey Bisque (Caucasian) did advise me that they felt Ed Timmerman was not treating them nicely, and relayed an incident were Mr. Timmerman pushed Mr. Bisque and knocked his helmet off. I looked into this situation and determined that Mr. Timmerman had jabbed Mr. Bisque in the shoulder to get his attention over the noise of the chipper, and that when he did so, Mr. Bisque's helmet came off his head. During my investigation into this incident, no one mentioned to me that Mr. Timmerman or Mr. Christian were treating Mr. Williams unfairly, using racial epitaphs [sic] or otherwise harassing Mr. Williams. I knew Mr. Timmerman could be

-42-

> loud, abrasive and demanding, and often received
> complaints from employees regarding his bad attitude.
> These complaints came from white employees as well as
> Mr. Williams and Mr. Bisque. Following their
> complaint, I verbally reprimanded Mr. Timmerman and
> advised him that any further conduct whereby he touched
> an employee would result in disciplinary action. This
> was the first time I ever learned of Mr. Timmerman
> touching another employee (when he jabbed Mr. Bisque in
> the shoulder). I had no reason to believe that Mr.
> Timmerman had ever done this before or would do it
> again, in light of my verbal reprimand.

(Sanders Decl. Doc. # 23-4 at 3-4).

The declaration of Hawley indicates that he received a copy

of a letter from the NAACP in June of 2004, and that such letter

alleged that Defendant discriminated against Williams. (Hawley

Decl. Doc. # 23-3 at 3). As described earlier in this Order,

Hawley conducted an investigation after receiving the NAACP's

letter. A portion of the investigation report is quoted at

footnote one. The investigation report further states:

> On the allegations that Royce and Joey went to Ed
> Sanders seem not to be true as Ed Sanders indicates
> this did not happen and in light of other statements
> that create contradictions it would seem that the claim
> that both went to Ed Sanders can not be substantiated.
> In the case of Joey Bisque being allegedly out caste
> [sic] for liking Royce Williams, this would seem to be
> totally false due mostly in part to the fact that Joey
> him self admits to being involved in a great deal of
> lunch time playing around with at least five other
> employees. On Joey Bisque's claim that he was called a
> "wigger," "Nigger-lover," or "southern disgrace" or
> "white trash," I found nothing in any interview to
> support this claim. I did find sufficient evidence
> that Ed Timmerman had grabbed Joey Bisque and pulled
> off his earmuffs while Joey was working behind the

-43-

> chipper.  My investigation found that Ed Timmerman had
> done this to other employees as well in various degrees
> and that he often would lose his temper and yell at
> employees.  Ed Sanders has stated he approached Ed
> Timmerman about this behavior.

(Ex. to Hawley Dep. Doc. # 30-15 at 14-15).

During Plaintiff's deposition, he was asked whether he reported the incident when Christian asked Plaintiff to run through the bushes "like a hog" and be chased by hunting dogs. Plaintiff responded that he did not "report" the incident to his supervisors because all of his supervisors were there to see the incident for themselves.  (Pl.'s Dep. Doc. # 23-6 at 78-79). Plaintiff explained that Ed Sanders, the general foreman, was present at the time of the incident, and that Sanders, as well as other witnesses to the incident, laughed at Plaintiff and at the comment. (Id.)

There are genuine issues of material fact as to whether Defendant negligently retained Timmerman and Christian after hearing the complaints of Plaintiff and Bisque.  Accordingly, Defendant's motion for summary judgment is denied as to Plaintiff's negligent retention claim.

## IV. Conclusion

This Court denies Defendant's Motion for Summary Judgment in all respects.

Accordingly, it is now

-44-

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant's Motion for Summary Judgment (Doc. # 22) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this <u>27th</u> day of July, 2006.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel and Parties of Record